```
                                    FILED
                             U.S. DISTRICT COURT
                            EASTERN DISTRICT OF LA

                             2001 JUL 17 PM 3:36

                              LORETTA G. WHYTE
                                   CLERK
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TRAVELERS PROPERTY CASUALTY AND CII CARBON, L.L.C.** | * | |
| | * | CIVIL ACTION NO. 00-0130 |
| VERSUS | * | SECTION "L" |
| THE MG-332 AND MGR-39, her engines, tackles, boilers, furniture, apparel, etc., *in rem* | * | MAGISTRATE (2) |
| **MGT SERVICES, INC.** d/b/a **MGT TRANSPORT SERVICES, INC.**, d/b/a **MGT-T SERVICES, INC.** *in personam,* | * | |
| **ST. JOHN FLEETING, INC.**, *in personam,* | * | |
| **ST. JOHN FLEETING, L.L.C.**, *in personam,* | * | |
| **ABC INSURANCE COMPANY**, *in personam,* | * | |
| AND | * | |
| **XYZ INSURANCE COMPANY**, *in personam* | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY WAYNE COXE, RODDY HURST AND PROFESSIONAL MARINE SURVEYORS AND CONSULTANTS

**MAY IT PLEASE THE COURT:**

Plaintiffs, Travelers Property Casualty ("Travelers") and CII Carbon, L.L.C. ("CII"), submit this Memorandum in Opposition to the Motion for Summary Judgment filed by Wayne Coxe, Roddy Hurst and Professional Marine Surveyors and Consultants (collectively "Professional Marine").

1

MGT Services, Inc.'s ("MGT") filed a counterclaim against CII, alledging that the barges MG-332 and/or MGR-39 were overloaded, and that the overloading was a cause of the barges' sinking. Professional Marine, through Wayne Coxe and Roddy Hurst performed a "cleanliness inspection" prior to the loading of the barges by Cooper/T. Smith Stevedoring Company, Inc., and a draft survey subsequent to the barges being loaded. Plaintiffs' submit that the barges were <u>not</u> <u>overloaded</u>. If, however, this Court determines that the barges were overloaded, then Professional Marine was negligent and should not be dismissed from this lawsuit.

## THE BARGES WERE NOT OVERLOADED

Plaintiffs agree with Professional Marine's position that the barges were not overloaded. This is clearly supported by the deposition testimony of MGT's own expert, Mr. Arthur Darden, Jr., as outlined by Professional Marine in its Memorandum in Support of Motion for Summary Judgment. There is also no reasonable dispute that the amount of cargo loaded into each barge was <u>not</u> greater than the maximum carrying capacity of the barges. The maximum capacity of the MG-332 was 1,870 short tons, with a draft of 10 foot-8 inches.[1] The maximum capacity of the MGR-39 was 1,824 short tons, with a draft of 10 foot 8-inches.[2] The MG-332 was, in fact, only loaded with <u>1831.384 short tons</u> of cargo, and had a post-loading draft of approximately <u>10 feet-7 inches</u>. The MGR-39 was only loaded with approximately 1620.104 short tons of cargo,

---

[1] See Exhibit "A", Cooper/T. Smith Stevedoring Stowage Plan. Also the deposition of Wayne Coxe of Professional Martine confirms this provision in the Stowage Plan and that the amount loaded was less than that stated capacity.
[2] Id.

2

and had a post loading draft of approximately 9 feet-11 inches.[3] The expert testimony of Mr. Arthur Darden, MGT's own expert, makes it abundantly clear that the barges were not overloaded. In this regard, plaintiffs and Professional Marine do not disagree.

### PROFESSIONAL MARINE CANNOT BE DISMISSED UNLESS THE COUNTERCLAIM IS ALSO DISMISSED

As long as MGT's counterclaim against CII exhibits, Professional Marine cannot be dismissed. MGT's counterclaim vaguely alleges that if the barges were overloaded, then CII breached the contract of affreightment, and is therefore liable to MGT for the damages to the barges. Additionally, Traveler's and CII's recovery for the damage to the cargo could be diminished by the percentage of fault attributable to the overloading of the barges. CII's position is two-fold: (1) the barges were not overloaded, but (2) if the barges were overloaded, then it is due to the negligence of Cooper/T. Smith Stevedoring Company, Inc. for improperly loading the barges (as alleged in plaintiff's recent Amended Complaint for Damages), and also the negligence of Professional Marine for failing to notice and/or report that the barges were overloaded.

Professional Marine argues in its Memorandum in Support of Motion for Summary Judgment that Professional Marine was only there to perform limited functions, namely a "cleanliness inspection" and a draft survey. The draft survey was performed to determine the amount of cargo loaded into the barges. It necessarily follows that if the barges were overloaded, then the draft surveyor who took the draft measurements and made the draft calculations should

---

[3] See deposition of Wayne Coxe at pp. 82-84, Exhibit "B".

3

have known that the barges were overloaded. Furthermore, Mr. Wayne Coxe testified that his draft readings and calculations were not provided to MGT or CII until at least June 25, 1999, which is only one day before the barges sank, and three to four days after the barges were loaded and the surveys by Professional Marine were done. Accordingly, there was no way for CII to know whether the barges were overloaded, and consequently there was no way for CII to remedy any overloading situation.[4]

Also significant is the fact that the MG-332 had a list at the time that the draft surveys were performed by Professional Marine. Wayne Coxe and Roddy Hurst would have been among the first individuals after the loading to know that the MG-332 had a list to it. In the plethora of reports by the various experts in this matter, and the deposition testimony of several St. John Fleeting, Inc.'s captains and deck hands, the MG-332 was discovered to have a list prior to its sinking on June 26, 1999. Professional Marine had knowledge shortly after the loading process of the condition of the MG-332, yet there was no report furnished to CII or MGT until after June 25, 1999. It was too late then and the list obviously worsened. The MG-332 filled with water from the heavy rains and sank, dragging the MGR-39 down with it.

If MGT's claims are correct, then Professional Marine should remain as a defendant to respond for its negligence and for any reduction in recovery by CII and Travelers, and for any damages CII may be found to owe MGT. The surveyors would be responsible for failing to

---

[4]See deposition of Wayne Coxe at p. 85, Exhibit "B".

4

determine that the barges were overloaded and/or failing to notify CII or MGT of the draft readings and of the MG-332's list.

Until a determination is made that the barges were not overloaded, there exist genuine issues of material fact which preclude Professional Marine Motion for Summary Judgment from being granted.

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP**

By: _____
 RICHARD A. CHOPIN, T.A. (Bar No. 4088)
 **JASON P. FOOTE (Bar No. 25050)**
 Two Lakeway Center, Suite 900
 3850 North Causeway Boulevard
 Metairie, LA 70002-1752
 (504) 830-3838
 **Attorneys for Plaintiffs,
 Travelers Property Casualty
 and CII Carbon, L.L.C.**

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on this 17th day of July, 2001, served a copy of the foregoing pleading on counsel for all parties, by mailing same by United States Mail, properly addressed, and first class postage prepaid.

_____
JASON P. FOOTE

# Cooper / T. Smith Stevedoring
## Stowage Plan
### M/S ARGONAUT

| Start time | | | | | | Date 16 JUNE, |
|---|---|---|---|---|---|---|
| Completion time | | | | | | Customer CII |
| | | | | | | Agent GULF INLAND 647-2770 |

| HOLD #5 COKE | HOLD #4 COKE | HOLD #3 COKE | HOLD #2 COKE | HOLD #1 COKE |
|---|---|---|---|---|
| | | CH 9841 L/S 2100ST 11' 08" | | |
| | | MGT 111 (O) 2096ST 11' 08" | | |
| | | MG 493 (O) 2015ST 10' 08" | | |
| | | MG 494 (O0 2015ST 10' 08" | | |
| | | MG 513 (O) 1820ST 10' 08" | | |
| | | MG 524 (O) 1873ST 10' 08" | | |
| | | MG 685 (O) 1835ST 10' 08" | | |
| | | MG 687 (O) 1835ST 10' 08" | | |
| | | MG 921 (O) 1870ST 10' 08" | | |
| | | MGL 5725(O) 2062ST 11' 08" | | |
| | | MGR 39 L/S 1824ST 10' 08" | | |
| | | HM 507 L/S 1915ST 11' 08" | | |
| | | MGT 112 (O) 2096ST 11' 08" | | |
| | | MGT 125 (O) 2062ST 11' 06" | | |
| | | MGT 101 (O) 2096ST 11' 08" | | |
| | | MG 332 (O) 1870ST 10' 08" | | |
| | MG527 (O) 1879ST 10' 08" | | | |
| | MG 851 L/S 2023ST 10' 06" | | | |
| 6690 M/T | 6800 M/T | 6750 M/T | 6760 M/T | 599.2 M/T |

Total Cargo 32,991.2 M/T      36,366.2 S/T



EXHIBIT A

Page 80

[1] A: That's not our writing. I don't
[2] know where you got that copy from, but
[3] that's not from us.
[4] Q: Okay. So a clean document would
[5] have been sent to CII Carbon is what you're
[6] telling me?
[7] A: Correct.
[8] Q: Do you know what these other
[9] initials stand for? I can tell Gramercy and
[10] Chalmette are likely the bottom two. How
[11] about "JOC" and "JOG," do you have any idea?
[12] A: No. I would only be guessing.
[13] Q: To your knowledge, Professional
[14] Marine Surveyors did not send this Tonnage
[15] Certificate to M/G-T Services?
[16] A: To my knowledge, no.
[17] Q: Let's assume for a second that the
[18] barge MG 332 was either improperly loaded or
[19] overloaded. Do you have any idea how,
[20] absent somebody from M/G or CII Carbon being
[21] present, how they would obtain information
[22] in that regard?
[23] MR. McMAHON:
[24] Who would obtain what information
[25] in what regard?

Page 81

[1] THE WITNESS:
[2] I have no idea.
[3] MR. McMAHON:
[4] I don't understand.
[5] EXAMINATION BY MR. STAINES:
[6] Q: Did you understand my question?
[7] A: Yes. As to how they found out, I
[8] don't know.
[9] Q: I was talking about M/G and CII
[10] Carbon. I thought it was clear. Do I need
[11] to repeat the question or did you
[12] understand?
[13] A: No. Please repeat it.
[14] Q: Do you want me to repeat it?
[15] A: Yes.
[16] Q: Assuming that the barge MG 332
[17] would have been either improperly loaded or
[18] overloaded, do you know how M/G-T Services
[19] or CII Carbon would have obtained
[20] information in that regard absent someone
[21] from their respective entities being present
[22] at the location of the loading?
[23] A: I have no idea.
[24] MR. McMAHON:
[25] Well, I wanted to enter an

Page 82

[1] objection in there, but subject to the
[2] objection, you can answer.
[3] EXAMINATION BY MR. STAINES:
[4] Q: Would anyone from Professional
[5] Marine Surveyors provide any information,
[6] generally speaking, to any entity after a
[7] barge is loaded as to whether in their
[8] opinion the barge is either overloaded or
[9] improperly loaded?
[10] A: Normally, no.
[11] Q: After Mr. Hurst went to St. John
[12] to look at the MG 332, do you recall him
[13] advising you or anyone else at Professional
[14] Marine Surveyors whether in his opinion the
[15] barge was either improperly loaded or
[16] overloaded?
[17] A: No.
[18] Q: During the course of your survey,
[19] in your presence at Cooper, did you receive
[20] any information as to the maximum amount of
[21] coke that was to be loaded in the MG 332 in
[22] June of 1999?
[23] A: We received a fax from Cooper
[24] listing the barges that are to be supplied
[25] by M/G for that ship, and on that sheet it

Page 83

[1] has draft, maximum draft, or draft that it's
[2] supposed to be loaded to. That's it. We
[3] pay no attention to the drafts. We're only
[4] there to check, survey the barge in and out.
[5] Q: Well, in the course of your
[6] checking the barge out, doing your survey to
[7] check the barge out, is it your job to
[8] insure that the barge is not overloaded?
[9] A: No.
[10] Q: It's not?
[11] A: No.
[12] Q: Whose responsibility is it if the
[13] barge is overloaded?
[14] A: I would tell you we're only on for
[15] tonnage purposes, how much is loaded on the
[16] barge.
[17] Q: Is that a part of your records?
[18] A: Yes, it is.
[19] Q: That document?
[20] A: It's right there in your hand.
[21] That's it.
[22] Q: All right. You're referring to
[23] what I'm marking as Deposition Exhibit
[24] No. 9, and this is called a Cooper/T. Smith
[25] Stowage Plan?

EXHIBIT B

Page 84

[1] A: Correct.
[2] Q: And under "Hold No. 3," there's a
[3] reference to the barges that the cargo was
[4] going to go into from hold No. 3, I presume;
[5] is that right?
[6] A: I assume it's for the whole ship.
[7] They just put it there, but it's for the
[8] whole ship.
[9] Q: Okay. And the number that's next
[10] to the MG 332, I guess the "O" is for open
[11] hopper?
[12] A: Yes.
[13] Q: And then "1870ST" means 1870 short
[14] tons?
[15] A: Correct.
[16] Q: And you understand that to be the
[17] maximum allowed for that barge, to be loaded
[18] in that barge?
[19] A: I understand that's what they're
[20] supposed to load at, 10-foot eight draft.
[21] Q: And going back to Exhibit No. 6,
[22] the "forward port" draft reading upon
[23] completion was 11-foot two and a half
[24] inches, correct?
[25] A: Right.

Page 85

[1] Q: And the "midship port" reading was
[2] 11-foot three-quarters of an inch, correct?
[3] A: Correct.
[4] Q: But those readings weren't
[5] provided to M/G or CII until June 25th, to
[6] your knowledge, or at least to CII until
[7] June 25th?
[8]         MR. McMAHON:
[9]     Objection.
[10]         THE WITNESS:
[11]     Probably after.
[12]         EXAMINATION BY MR. STAINES:
[13] Q: After June 25th; is that right?
[14] A: Probably when they got the typed
[15] report.
[16] Q: All right. The other documents
[17] that you have provided me, can you identify
[18] this document for me, please.
[19] A: These are the start and completion
[20] times of all of the barges loaded from the
[21] ARGONAUT supplied to me by Cooper/T. Smith.
[22] Q: When was that provided to you?
[23] A: I don't have an exact date.
[24] Probably the 25th when the ship had
[25] finished, but I don't remember exactly what

Page 86

[1] date.
[2] Q: Okay. We marked this document as
[3] Deposition Exhibit No. 10.
[4]     All right. The next one I have is
[5] the MG 332 "Barge Calculations," I think
[6] that's what it's called?
[7] A: Right.
[8] Q: That's a two-page exhibit. Would
[9] you identify that for me, please.
[10] A: This is a handwritten sheet that
[11] we fill in for the freeboard to do the
[12] calculations to feed into the computer for
[13] tonnages, and this is a computer printout of
[14] the tonnage from that barge.
[15] Q: The first page is the computer
[16] printout of the tonnage?
[17] A: The second page is the
[18] handwritten, and the first page is the
[19] computer printout of the calculations.
[20] Q: That's essentially the same
[21] information that's on your survey report?
[22] A: That is typed from this
[23] (indicating). Exhibit 6 is typed from that
[24] one.
[25] Q: Exhibit 6, the survey report

Page 87

[1] information, is typed from what we are
[2] calling now Exhibit 11, correct?
[3] A: Yes. If I could say something, on
[4] the second sheet, the handwritten, you will
[5] see the zero to eight inches is where it's
[6] documented, the water from the sludge.
[7] That's from the second sheet, though.
[8] That's where I write it down.
[9] Q: Now, when would you have made
[10] this, the writings on this second page of
[11] Exhibit 11? Would that have been on the
[12] scene or at the office or where?
[13] A: That was at the office.
[14] Q: On this Exhibit 6, again, with
[15] respect to the information under the
[16] subtitle note, where it refers to "zero to
[17] eight inches of water, sludge and scale
[18] prior to and after receiving cargo" —
[19] A: Correct.
[20] Q: — the significance of including
[21] "after receiving cargo" is to indicate that
[22] it wasn't pumped out or removed in any other
[23] fashion; is that correct?
[24] A: No change.
[25] Q: Did you make any recommendations