

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JUL 18 PH 1:43

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

TRAVELERS PROPERTY CASUALTY, et al.

-VERSUS-

THE MG-332 and MGR-39, etc., et al.

CIVIL ACTION

NUMBER 00-0130

SECTION L (2)
JUDGE FALLON
MAGISTRATE WILKINSON

: : : : : : : : : : : : : : : : : : : : : : : :

### OPPOSITION OF ST. JOHN FLEETING, INC.
### TO MOTION FOR SUMMARY JUDGMENT
### FILED ON BEHALF OF WAYNE COXE, RODDY HURST
### AND PROFESSIONAL MARINE SURVEYORS & CONSULTANTS

MAY IT PLEASE THE COURT:

St. John Fleeting, Inc. ("St. John") opposes the Motion for Summary Judgment filed on behalf of Wayne Coxe, Roddy Hurst, and Professional Marine Surveyors & Consultants (hereinafter collectively referred to as "Professional Marine"). The introductory facts provided by Professional Marine in its supporting memorandum are not disputed. Neither does St. John dispute the fact that Professional Marine did not load the barge MG 332 nor observe the loading. Rather, Professional Marine, as it contends, undertook surveys for cleanliness and draft readings of the barge pursuant to its contractual arrangement with CII Carbon, Inc. ("CII"). However, Professional Marine's activities undertaken in performing its inspection for cleanliness and draft readings obligated

____Fee____
____Process____
X  Dktd____
____CtRmDep____
Doc.No.____

Professional Marine to provide CII with information pertinent to the condition of the barge as it pertains to the loading of the barge. Professional Marine failed to satisfy its obligation in this regard and for that reason, its Motion for Summary Judgment must be denied.

While Professional Marine cites the testimony of Arthur Darden, M/G-T Services, Inc.'s expert marine engineer/naval architect, it fails to provide the Court with the contrary opinion of Kenneth P. Helmrich of K.P. Helmrich & Associates. Mr. Darden testified, in his opinion, that the barge was not overloaded. The opinions of Mr. Helmrich indicate otherwise and suggest that the barge was very heavily loaded to its maximum draft or just beyond, producing an extremely low freeboard and this was a contributing factor to the sinking of the barge MG 332. (See reports of K. P. Helmrich & Associates of October 11, 1999, and September 3, 1999, attached as Exhibits "A" and "B," respectively.)

Moreover, the contract of affreightment (attached as Exhibit "C") between CII and M/G-T Services, Inc. ("M/G-T") applicable to the loading in question specifies that:

> Proper loading and unloading of barge shall be SHIPPER's responsibility and shall be accomplished by SHIPPER at its sole expense and risk. SHIPPER shall comply with CARRIER's instructions regarding the height of load, weight of load, draft of barge, and other such instructions as CARRIER may deem desirable for safe transportation, and SHIPPER shall distribute cargo in barges to ensure an even draft. If barge are not so loaded, then SHIPPER shall at its expense make such corrections as necessary to meet CARRIER's requirements in which event the barge shall be subject to demurrage provided herein from time of placement of barge until acceptance of barge by CARRIER. Any additional cost or expense or loss of damage incurred by CARRIER as a result of improper loading or improper unloading shall be for the account of the SHIPPER.

While Professional Marine was not a party to the contract of affreightment, both CII (shipper) and M/G-T (carrier) assumed certain obligations/responsibilities regarding the loading of the barge

MG 332. In this regard, information regarding the draft, freeboard, and conditions of the barge found by Professional Marine were essential to CII and M/G-T, satisfying their respective obligations/responsibilities.

As Professional Marine noted in its supporting memorandum, Wayne Coxe performed a pre-load draft survey of the barge MG 332 on June 21, 1999, and Roddy Hurst performed a post-load draft survey of the barge MG 332 on June 22, 1999. Interestingly, none of the information obtained by Messrs. Coxe and Hurst was provided to CII's representative until June 25, 1999. On June 25, the barge was situated in the St. John Fleeting fleet and its tanks were pumped on that date due to its prevailing condition. However, only the tonnage certificate was sent on the 25th of June and the draft readings would not have been conveyed to CII until the displacement survey report was sent, which would have been some time after June 25, and presumably after the barge sank. (Please refer to deposition testimony of R. Wayne Coxe, pages 74-79, attached as Exhibit "D," *en globo*).

The displacement survey (attached as Exhibit "E") reveals that the draft readings undertaken by Professional Marine of the barge MG 332 indicates post-draft findings of 11', 2-1/2" for the forward port and 10', 1-3/4" for the forward starboard. Thus, after loading, the barge at the forward port had less than 1' freeboard. Additionally, the recordings by Mr. Hurst noted on his barge information sheet (attached as Exhibit "F") revealed 10" of water found in the port No. 1 wing tank. While we have no specific measurements or readings from the pre-draft inspections of the wing tanks by Mr. Coxe, he did refer to 0"-8" of water throughout the tanks found in the pre-draft inspection. This would lead to the assumption that there was a difference in the amount of water found in the port No. 1 wing tank as between the pre-draft and post-draft inspections. Considering the less than 1' draft on the forward port side with nearly 1' of water in the port No. 1 tank, it can be reasonably

-3-

concluded that the barge was heavily loaded with a list to the port side. Such information was indicative of a problem which should have and could have been conveyed immediately to CII so that measures to determine the integrity of the barge could have been considered prior to the barge's departure from the loading facility. However, Professional Marine, with knowledge of a heavily loaded barge listing with water in its tanks more so after loading than prior to loading, took no action to notify its customer, the cargo owner, who in turn could take no measures to ensure that the barge was fully capable of maintaining its integrity with the load of cargo maintained in the barge at that time.

Clearly, Professional Marine, through its expert surveyors who have performed a voluminous number of draft surveys, were in possession of information indicative of problems with the freeboard and trim of a barge which it ignored. Professional Marine's expert surveyors chose to rely on its assumed obligation that it only took draft readings and owed to its customer no obligation to provide it with information regarding the freeboard and condition of the barge. Such a blind sided approach to a survey of a barge could potentially result in the cargo owner and barge owner relying on the surveyor's expertise and expecting notification from the surveyor when a barge presents potential problems. Neither the cargo owner nor the barge owner were present at the time of the draft readings nor loading. Therefore, it was incumbent upon the surveyor (and possibly the loading stevedore) to convey information regarding the condition of the barge after loading so that either the shipper or carrier could determine whether the integrity of the barge could maintain the load for its intended voyage. Obviously, in hindsight, the barge did not maintain the load due to its sinking. However, it is also now known from the deposition testimony of Professional Marine's expert surveyors that

they failed to convey information regarding the condition of the barge MG 332 which should have been forwarded to the customer, CII.

Accordingly, St. John respectfully submits that Professional Marine had a responsibility to convey information that it knew or should have known regarding a problem with the barge MG 332 once it took draft readings of the barge after it was loaded on June 22, 1999. However, Professional shrugged its responsibility in this regard and failed to notify or advise any party, including CII, the cargo owner, until after June 25, of the draft readings and recordings of water in the tanks. For this reason, Professional Marine faces exposure to liability in this case and should not be dismissed from this litigation.

Respectfully Submitted;

STAINES & EPPLING

ANTHONY J. STAINES, T.A. (12388)
3500 No. Causeway Blvd.
Suite 820
Metairie, LA 70002
Telephone: (504) 838-0019
Counsel for St. John Fleeting, Inc.

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by the service method indicated below:

[✗] U.S. Mail
[ ] Hand Delivery
[ ] Fax
[ ] Other

This 17 day of July 2001.

-5-

# K. P. HELMRICH & ASSOCIATES

P. O. BOX 1574  •  KENNER, LOUISIANA 70063  •  PHONE: (504) 469-1029   469-1009

**MARINE SURVEYORS AND CONSULTANTS**
October 11, 1999

Travelers Property & Casualty
Ocean Marine, Suite 950
3900 N. Causeway Blvd.
Metairie, Louisiana 70002
Attention: Mr. John Treitler

Re:  Calciner Industries
     Chalmette, Louisiana
     Cargo Claim
     Raw Bulk Coke
     Your File: BE81364
     Our File: 99-5407

Dear Mr. Treitler:

In response to your letter of October 4, 1999 and your request to
be more definitive as to the cause of sinking of the Barge "MG-332"
I offer the following:

In answer to your question concerning a definite cause of loss,
there is none.

There are three (3) contributing factors that in my opinion caused
the Barge "MG-332" to sink.

The heavy load of green coke which produced extremely low freeboard
only allowed the vessel to sink more rapidly or in a quicker time
frame if other outside factors were applied.

The 76.01 tons of rain water increased the weight of the barge thus
allowing for less freeboard and made it possible for fractures in
the barge that would normally be above the waterline to be placed
below the waterline allowing free communication of water into the
vessels hull.

It was a known factor that the barge had splits and fractures in
the hull and hopper which allowed free communication of the water
into the hull and hopper.



Mr. John Treitler
Page 2


Based on the foregoing it is my opinion that each of the foregoing were contributing factors to the sinking of the Barge "MG-332" and when brought together caused the sinking. It is beyond the writer purview to determine if of the above factors had more burden than the other, however; had the barge not been a leaker or had fractures and/or cracks in the hull above or below the waterline at any level the barge most like would not have sunk.

If you have any further questions please feel free to contact us.

Respectfully,

Kenneth P. Helmrich

# K. P. HELMRICH & ASSOCIATES

P. O. BOX 1574 • KENNER, LOUISIANA 70063 • PHONE: (504) 469-1029  469-1009

**MARINE SURVEYORS AND CONSULTANTS**

September 3, 1999

Travelers Property & Casualty
Ocean Marine, Suite 950
3900 N. Causeway Blvd.
Metairie, Louisiana 70002
Attention: Mr. John Treitler

Re:  Calciner Industries
     Chalmette, Louisiana
     Cargo Claim
     Raw Bulk Coke
     Your File: BE81364
     Our File: 99-5407

Dear Mr. Treitler:

As per your request to develop further information as respects the
sinking of Barge "MG-332" we have gathered information and offer
the following:

Enclosed please find a copy of Professional Marine Surveyors &
Consultants survey conducted to determine by light and loaded draft
the actual quantity of cargo coke in bulk as respects the Barge
"MG-332", Louisiana Office of State Climatology, Louisiana State
University, Baton Rouge daily precipitation calendar reference
month of June 1999.  General calculations for the barge to
determine its tons per inch emersion or cargo capacity in tons
short and the calculation sheet for Barge "MG-332" to determine
tons per inch and submersion of draft as respects the subject barge
from rain water accumulation.

Professional Marine Surveyors & Consultants of Baton Rouge,
Louisiana, draft survey for the Barge "MG-332" show a mean of means
draft when loaded of 10'-06.95" which will round off to almost 10'-
7".  Their survey further states that the subject vessel was loaded
with 1,831.384 short tons of coke in bulk.  The draft survey also
notes that the vessel's voids were found to contain approximately
0-8" of water, sludge, and scale prior to and after receiving
cargo.



Mr. John Treitler
Page 2

Calculations as respects the maximum capacity of cargo that can be loaded as respects the Barge "MG-332" is approximately 1,819.68 tons short based on our work sheet attached. It should be noted that these calculations were based on a standard 195' x 35' x 12' raked bow standard river barge without covers and it should be further noted that the barge strapping tables were not available to the writer when making these calculations and these computations were further made assuming that the barges voids were clean and free of debris and water.

Based on the foregoing it is the opinion of the writer that the Barge "MG-332" was considered to be a very heavy load and was loaded to its maximum draft or just beyond.

It was reported that the Barge "MG-332" arrived at St. John's Fleet on or about Saturday, June 23, 1999 and reportedly sunk on June 27, 1999.

The writer invites attention to Louisiana Office of State Climatology daily precipitation calendar for the Reserve, Louisiana Station. The month of June between the dates of June 23 and June 27th reflect that approximately 7.9" of rainfall occurred. This would also include the St. John's Fleeting area. This total reflects 7.9" of rain was round off to approximately 8".

The writer has performed calculations as respects rainfall and how it effected the overall draft of the Barge "MG-332" (see rainfall verses barge draft calculations). Approximately 76.01 tons of water given the TPI of 17 tons per inch equates to adding 4.47" of additional draft to the Barge "MG-332" (when rounded off equals approximately 4.50")

Based on Professional Marines loaded draft of approximately 10'-7" and further increasing that draft by approximately 4-1/2" from the weight generated by the accumulation of rain water the Barge "MG-332" had a draft of approximately 10'-11-1/2". The Barge "MG-332" having a construction depth of 12' and was drafting 10' 11-1/2" leaving a freeboard of 1'- 1/2".

St. John Cleaning & Repairs, LLC of Garyville, Louisiana effect repairs to the Barge "MG-332" as reflected in their invoice job #GWO722, GO726175, and G0714089. Invoice GW0722 is for cleaning the Barge "MG-332" after salvage. Invoice GO726175 deals with repairs to the barge resulting from salvage as well as repairing fractures and installing patches at various locations in way of the vessels stern, hopper, hopper floor, and hopper walls. Invoice G0714089 deals with repairs to the Barge "MG-332" by welding fractures and installing patches in way of the bow bulkhead, bow knuckles, installing patches in way of transom plate, stern bottom, and patching bottom plate in way of the bow, the no. 1, 2, 3, and 4 wing tanks.

Mr. John Treitler
Page 3

As respects the sinking of the Barge "MG-332" the writer offers the
following:

The Barge "MG-332" was loaded with coke in bulk to a draft of
approximately 10'-7" which is considered by the writer as a very
heavy load and exceeding the usual draft of 10' for a barge of this
nature and size.  The draft was further increased by the additional
76.01 tons of rain water gained by the barge from the period of
June  23  through  June  27th  which  increased  her  draft  to
approximately 10' 2 1/2".

In retrospect when a barge of this nature and size which has
construction depth of 12' is loaded to a safe draft of 10' 6" which
is more or less an industry standard there will be a free board of
1'-6".  When the Barge "MG-332" was loaded her freeboard was 1'-5"
and with the addition of the rain water her freeboard was reduced
to 1'-0-1/2".

Based on the foregoing the Barge "MG-332" had a freeboard of 1'-0
1/2".   Professional Marine Surveyors & Consultants reported the
barge to contain water in way of the vessels voids. Based on the
amount of repairs and patching carried out by St. John Cleaning &
Repairs, LLC it is the opinion of the writer that the Barge "MG-
332" was a leaker which allowed free communication of water between
the bottom and the hopper floors and walls.

In conclusion the Barge "MG-332" sank due to an extremely low
freeboard caused by a heavy load of coke in bulk.  The addition of
further weight to the barge by the 76.01 tons of rain water and the
leaking of the barge allowing free communication of water into the
hull and hopper via various fractures, and splits in the vessel's
hull.

If you have questions please feel free to contact us.

Respectfully,

Kenneth P. Helmrich

CERTIFICATE No.
NC-237

KPH/pkh

**BARGE "MG-332"**

General Calculations for Tons Per Inch Emersion

Standard Raked River Hopper Barge
(No Covers) 195' x 35' x 12'

18" freeboard max. on 12' hull

Draft: 18" fwd/16" aft = 1.8'/ 1.6' average = 3.40 mean draft
3.40' - 1.7 mean draft - decimals equivalent

17 tons per inch (TPI) industry standard for this size barge

Load draft------------------------------------ 10.50'
Submersion Factor Barge Empty------------------ 1.58'
                                               _____
                                                8.92'

8.92' x 12' = 107.04
               x   17 TPI
              _____
            1,819.68 Tons Short

## BARGE "MG-332"

Computation of rain fall as it effects barge draft.

Rain fall vs. barge draft calculations

Hopper inside dimensions Barge "MG-332"  156' x 28'

L-156' x w 28' x 8" of H2O
L-156' x W28' x .67' of H2O = 2,926.56 cu/ft of H2O
38.5 cu.ft./ton = 76.01 tons

76.01 tons of H20 given TPI of 17 ton/inch
equates to 4.47 inches of additional draft to the Barge "MG-332"

THIS IS TO CERTIFY that PROFESSIONAL MARINE SURVEYORS and CONSULTANTS, at the request of CII CARBON, L.L.C. did attend and survey the barge "MGT 332" while afloat at COOPER/T. SMITH MILE 180. The vessel was found to be an all-welded, steel-constructed, hopper barge with principal dimensions of 195 feet in length, by 35 feet in breadth, by 12 feet in depth.    The vessel has a raked bow with a single cargo hopper, fitted with wing compartments to port and starboard of cargo hopper and an interbottom space below cargo hopper.

The survey conducted to determine by light and loaded draft the actual cargo of COKE IN BULK .

## DISPLACEMENT SURVEY

|   |   |   | START 1515 HOURS JUNE 21, 1999 | COMPLETION 2140 HOURS JUNE 21, 1999 |
|---|---|---|---|---|
| 1. | a. | Forward Port | 2'00.75001" | 11'02.50000" |
|    | b. | Forward Starboard | 1'08.37501" | 10'01.75000" |
|    | c. | Forward Mean | 1'10.56251" | 10'08.12500" |
| 2. | a. | After Port | 1'03.75001" | 10'11.50000" |
|    | b. | After Starboard | 1'01.00000" | 10'00.37501" |
|    | c. | After Mean | 1'02.37500" | 10'05.93750" |
| 3. | | Mean Forward & After $\frac{\text{line 1c + 2c}}{2}$ | 1'06.46875" | 10'07.03125" |
| 4. | a. | Midship Port | 1'08.12500" | 11'00.75001" |
|    | b. | Midship Starboard | 1'04.62501" | 10'01.00000" |
|    | c. | Midship Mean | 1'06.37500" | 10'06.87500" |
| 5. | | Mean of Means $\frac{\text{line 3 + 4c}}{2}$ | 1'06.42188" | 10'06.95313" |

6.    Draft Corrected for Deformation
      line 40 + 5                                           1'06.39844"        10'06.91407"
         2

7.    Displacement Cubic Feet
      Fresh Water                                           9,206.604          68,083.164

8.    Displacement Tonnage
      Fresh Water                                           287.375            2,125.148

9.    Density                                               0.9965             0.9965

10.   Correction for Density                                1.006              7.396

11.   Corrected Displacement Tonnage                        286.369            2,117.753

12.   Difference Between Displacement
      at Start and Completion                               1,831.384

      TOTAL POUNDS                                          3,662.767.250

      SHORT TONS                                            1,831.384

      METRIC TONS                                           1,661.403

      LONG TONS                                             1,635.164

      NOTE:  Vessel's voids were found to contain approximately 0 to 8 inches of water,
sludge and scale prior to and after receiving cargo.

─────────────────────────────────────────────────────────────

      The foregoing statements are rendered without prejudice to the rights of party or
parties concerned.

Attending Surveyors:                        PROFESSIONAL MARINE SURVEYORS
                                            AND CONSULTANTS:

Roddy Hurst                                 R. Wayne Coxe
Marine Surveyor                             Certified Professional
                                            Marine Surveyor

Aug-19-99 10:13A Southern Reg Climate Ctr    225 388 2912        P.02

SOUTHERN REGIONAL CLIMATE CENTER                                    LOUISIANA OFFICE OF STATE CLIMATOLOGY

DAILY PRECIPITATION CALENDAR (Rainfall in Inches)

Station: RESERVE                    State: LA
Index No: 16-7767-09

Year: 1999                          Observation Time: 0800 Local Time

| Date: | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | :Date |
|-------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 1: | * | | L | L | L | L | L | Z | M | M | M | M | : 1 |
| 2: | 0.55 | | L | L | L | L | 0.13 L | Z | M | M | M | M | : 2 |
| 3: | 0.26 | | 0.21 L | L | L | L | 0.13 L | Z | M | M | M | M | : 3 |
| 4: | | 0.17 | L | L | L | L | 0.38 L | Z | M | M | M | M | : 4 |
| 5: | | | L | L | 0.90 L | L | 0.18 L | Z | M | M | M | M | : 5 |
| 6: | | | 0.24 L | L | L | L | 1.20 L | Z | M | M | M | M | : 6 |
| 7: | 0.30 | | L | L | L | L | 0.45 L | 0.04 Z | M | M | M | M | : 7 |
| 8: | 0.05 | | L | L | L | 0.64 L | L | Z | M | M | M | M | : 8 |
| 9: | 1.80 | | 0.53 L | L | L | L | 0.15 L | Z | M | M | M | M | : 9 |
| 10: | | | L | L | L | L | 0.48 L | 0.50 Z | M | M | M | M | :10 |
| 11: | | | L | L | 3.38 L | L | 0.11 L | 0.43 Z | M | M | M | M | :11 |
| 12: | | 0.03 | 0.20 L | L | L | 0.18 L | L | Z | M | M | M | M | :12 |
| 13: | | | 0.05 L | L | 0.28 L | 0.61 L | 0.06 L | Z | M | M | M | M | :13 |
| 14: | | | 0.95 L | L | L | 0.10 L | L | Z | M | M | M | M | :14 |
| 15: | | | L | 0.10 L | L | 1.45 L | L | 0.42 Z | M | M | M | M | :15 |
| 16: | | | L | L | L | 0.05 L | L | Z | M | M | M | M | :16 |
| 17: | | 0.05 | L | 0.08 L | L | 0.38 L | 0.31 L | Z | M | M | M | M | :17 |
| 18: | 0.50 | 0.18 | L | L | L | L | 0.01 L | Z | M | M | M | M | :18 |
| 19: | | | L | L | L | L | L | Z | M | M | M | M | :19 |
| 20: | | | L | L | L | L | 0.40 L | M | M | M | M | M | :20 |
| 21: | | 0.21 | L | L | L | L | L | M | M | M | M | M | :21 |
| 22: | | | L | L | L | L | L | M | M | M | M | M | :22 |
| 23: | 1.09 | | L | L | L | 0.10 L | L | M | M | M | M | M | :23 |
| 24: | | | L | L | L | L | L | M | M | M | M | M | :24 |
| 25: | | | L | L | L | L | 0.08 L | M | M | M | M | M | :25 |
| 26: | | | L | L | L | 1.42 L | L | M | M | M | M | M | :26 |
| 27: | | | L | 0.05 L | L | 6.38 L | 0.35 L | M | M | M | M | M | :27 |
| 28: | | 0.45 | L | L | L | L | 2.10 L | M | M | M | M | M | :28 |
| 29: | | ----- | L | L | 0.22 L | L | L | M | M | M | M | M | :29 |
| 30: | 0.30 | ----- | 1.30 L | L | 0.10 L | L | L | M | M | M | M | M | :30 |
| 31: | 0.10 | ----- | 0.65 L | ----- | 0.30 L | ----- | L | M | ----- | M | ----- | M | :31 |

Monthly
| | | | | | | | | | | | | | |
|-------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| Total: | 4.95 | 1.09 | 4.13 L | 0.23 L | 5.18 L | 11.31 L | 6.52 L | 1.39 M | M | M | M | M | |
| Norm: | 5.30 | 6.00 | 5.42 | 4.12 | 4.70 | 5.29 | 6.18 | 5.67 | 5.90 | 3.48 | 4.17 | 5.43 | |
| DFN: | -0.35 | -4.91 | -1.29 L | -3.89 L | +0.48 L | +6.02 L | +0.34 L | -4.28 M | M | M | M | M | |
| | | | | | | | | | | | | | |
| Max: | 1.80 | 0.45 | 1.30 L | 0.10 L | 3.38 L | 6.38 L | 2.10 L | 0.50 M | M | M | M | M | |

Annual Total:      34.80 M              Annual DFN:        -26.86 M

            M - daily observation is missing from record
              - monthly data includes missing observation(s) or is not available

            T - "TRACE" of rain (less than 0.01")
            * - daily rainfall is counted in measurement of next day
            Z - preliminary observation; no quality control (QC)
            L - preliminary observation; initial QC applied



# M/G-T Services, Inc.

LAKEWAY III  SUITE 3080
3838 N. CAUSEWAY
METAIRIE, LOUISIANA 70002
FAX: (504) 836-7086   (504) 836-7080



DEC 2 1 1998

## CONTRACT OF AFFREIGHTMENT

CII CARBON, LLC
Post Office Box 1306
Chalmette, LA 70044
ATTN:  William J. Doyle

SALE: # 2495
DATE: December 4, 1998

M/G-T Services, Inc., owner or chartered owner of the equipment described below, [hereinafter called "CARRIER"] hereby agrees to provide and CII CARBON, LLC [hereinafter called "SHIPPER"] hereby agrees to accept and use CARRIER's equipment on the following terms and conditions:

### SPECIAL CONDITIONS

| | | | |
|---|---|---|---|
| 1. | EQUIPMENT: | Four (4) or five (5) cargo vessels | |
| 2. | CARGO: | Raw Petcoke | |
| 3. | ORIGIN: | Darrow, LA | |
| 4. | DESTINATION: | 1) Chalmette, LA | 2) Gramercy, LA |
| 5. | FREIGHT RATE: | 1) $2.60 per net ton | 2) $2.35 per net ton |
| 6. | PLACEMENT/TERM: | January 1, 1999 through December 31, 1999 | |
| 7. | MINIMUM TONNAGE: | 1400 net tons per rake barge; 1600 net tons per box barge | |
| 8 | FREETIME: | Six (6) all purpose free days | |
| 9. | DEMURRAGE: | $150.00 per day per barge after free time expires | |
| 10. | INSURANCE: | CARRIER to provide Hull and P & I insurance on CARRIER's equipment. | |
| 11. | SPECIAL PROVISIONS: | | |

General Conditions on reverse side.
Failure of SHIPPER to execute or return this Contract of Affreightment to M/G-T Services, Inc. shall not relieve SHIPPER of his obligations under this contract; and the loading of cargo on CARRIER'S equipment shall constitute SHIPPER'S acceptance, in full, of all provisions of this Contract of Affreightment.

Agreed and accepted this 17TH__ day of __DECEMBER_____, 1999 1998

For __CII CARBON, L.L.C.__ (BUYER)

By _____
   C. VAN SHEETS, CEO

M/G-T SERVICES, INC.(SELLER)

By _____
   J. Kevin Jennings
   Executive Vice President



EXHIBIT
C

2

**NATURE OF CARRIAGE:** This is a private contract of affreightment and is not to be construed as a bareboat, demise or time charter, nor is it to be construed as a contract of common carriage.

**BILLS OF LADING:** Any bill of lading or other shipping document issued in connection with transportation of cargo under this contract of affreightment shall be considered acknowledgement of receipt only, it being the intention of the parties that this contract of affreightment is the document that contains all the terms and conditions agreed upon by the parties for the transportation and carriage of cargo. The terms and conditions of this contract of affreightment shall supersede over any terms and conditions contained in any bill of lading.

**CARRIER'S UNDERTAKING:** CARRIER undertakes to transport the cargo described herein but is unaware of the contents, weight, quantity, quality and condition of said cargo, and specifically but without limiting the generality of the foregoing, undertakes no duty to ascertain the characteristics of said cargo.

**PLACEMENT:** The rates stated herein shall include only one placement of barges by CARRIER at origin and one placement at destination. Any additional shifting of barges to accommodate loading or unloading or to otherwise accommodate SHIPPER shall be for SHIPPER's account, and if performed by CARRIER, will be charged at CARRIER's prevailing rate for such service.

**CLEANING AND ACCEPTANCE:** CARRIER shall tender barges which are in a condition suitable for the cargo to be carried. Loading of the barges shall constitute SHIPPER's acceptance of the condition and suitability of the barges for the carriage of the intended cargo. Rates do not include the cleaning expense that results from cargo or debris left aboard the barge in excess of that removed by normal cleaning (including working surfaces, gunnels, decks, covers, etc.) by SHIPPER or by its agents at both loading port and unloading port, and rates do not include the expense for the lawful disposal of such cargo and debris. Any and all charges (including disposal charges and necessary transportation expenses) encountered by CARRIER for removal and disposal of cargo or debris shall be in addition to the freight rate and shall be for SHIPPER's account, and shall be payable to CARRIER in the same manner as the freight rate stated herein.

**SHIPPER'S WARRANTY:** SHIPPER warrants that the cargo will be as described on the face hereof; and if any cargo is different than that described, then SHIPPER agrees to release, defend, indemnify and hold harmless CARRIER from and against any and all loss, damage, expense, cost, injury, death, fine or penalty arising out of or in any way connected with or in consequence to the breach of this warranty, even without the negligence of SHIPPER, and even though any such loss, damage, expense, cost, injury, death, fine or penalty shall result in part from the fault or negligence of CARRIER or from the unseaworthiness of any barge or vessel.

Unless otherwise agreed in writing by CARRIER, SHIPPER is prohibited from loading, shipping or transporting aboard CARRIER's equipment any "hazardous cargo" or "hazardous materials or substances" as those terms are defined by the U.S. Coast Guard or other regulatory agency having jurisdiction over the transportation of such cargoes; and SHIPPER warrants that the cargo described on the face hereof does not constitute or contain "hazardous materials or substances," and SHIPPER agrees to release, defend, indemnify and hold harmless CARRIER from and against any and all loss, damage, expense, cost, injury, death, fine or penalty arising out of or in any way connected with or in consequence to the breach of this warranty, even without the negligence of SHIPPER, and even though any such loss, damage, expense, cost, injury, death, fine or penalty shall result in part from the fault or negligence of CARRIER or from the unseaworthiness of any barge or vessel. In the event CARRIER agrees to carry and transport "hazardous cargo" or "hazardous materials and substances," then SHIPPER at its sole cost and expense shall obtain and provide all certificates, clearances, permits, inspection reports and all other documents required under applicable federal regulations to lawfully load, carry, transport and discharge said cargo; and SHIPPER shall release, defend, indemnify and hold harmless CARRIER from and against any and all loss, damage, expense, cost, injury, fine or penalty resulting from SHIPPER's failure to obtain said certificates, clearances, permits, inspection reports and all other documents to authorize the lawful movement of said "hazardous cargo" or "hazardous materials and substances" aboard CARRIER's equipment.

**LOADING AND UNLOADING:** SHIPPER warrants that CARRIER's equipment shall have safe berth at points of loading and unloading, free of wharfage, dockage, and port charges. Proper loading and unloading of barge shall be SHIPPER's responsibility and shall be accomplished by SHIPPER at its sole expense and risk. SHIPPER shall comply with CARRIER's instructions regarding the height of load, weight of load, draft of barge and other such instructions as CARRIER may deem desirable for safe transportation, and SHIPPER shall distribute cargo in barges to ensure an even draft. If barges are not so loaded, SHIPPER shall, at its expense, make such corrections as necessary to meet CARRIER's requirements, in which event the barge shall be subject to demurrage charges provided herein from time of placement of barges by CARRIER. Any additional cost or expense or loss or damage incurred by CARRIER as a result of improper loading or improper unloading shall be for the account of the SHIPPER.

**MOVEMENT OF CARGO:** SHIPPER at its sole cost and expense shall obtain and provide all certificates, clearances, permits, surveys, inspection reports and all other documents required under applicable federal regulations to lawfully load, carry, transport and discharge the cargo named herein. Barges shall move only at the convenience of CARRIER, either as a single unit or with one or more other barge units. CARRIER is not bound to transport the cargo by any particular craft or in time for any particular market or otherwise than with reasonable dispatch. CARRIER shall have the right to itself or interchange the tow from one to another towing vessel as it (in its sole discretion) may find convenient or expedient. CARRIER shall have the right to transfer the cargo described herein from the barge into which the cargo was originally loaded to one or more other barges, and CARRIER shall have the right to tie off the tow at any point and for any purpose. CARRIER shall also have the right to procure towage from vessels not owned, chartered or operated by CARRIER. CARRIER shall also have the right to deviate from its normal route and to call at any port in any order CARRIER chooses, including those ports outside its normal route.

**PAYMENT OF FREIGHT:** The entire amount of the freight shall become earned and due and payable to CARRIER at the inception of the voyage, and shall be payable in cash or check and without discount, cargo lost or not lost, cargo damaged or not damaged, in whole or in part, at any stage of the voyage. CARRIER shall have a lien against the cargo for payment of freight, demurrage and for all other charges due under this contract of affreightment, which lien shall survive delivery of the cargo. All freight, demurrage and other charges shall be subject to an interest charge of 1½% per month beginning 30 days after date of invoice. Without prejudice to CARRIER's other rights herein, CARRIER shall have the right to cancel this contract of affreightment and withdraw its equipment in the event of SHIPPER's nonpayment of freight and/or other monies due 30 days after date of invoice or in the event of any other default of SHIPPER. SHIPPER shall pay all costs and reasonable attorney's fees incurred by CARRIER for the prosecution and collection of all freight, demurrage and other charges due and payable to CARRIER under this contract of affreightment.

**TAXES, TOLLS & USER CHARGES:** SHIPPER shall be responsible to pay all transportation or other excise taxes on freight and any taxes, dues or other charges on the cargo. Should any wharfage charge, waterway toll, port charge, user tax, user charge or any equivalent of the same be levied or charged relating to the transportation to be performed hereunder or to the equipment or fuel used in performing such transportation, then the cost of such toll, charge, tax or equivalent shall be for the account of SHIPPER and shall be payable to CARRIER in the same manner as the freight rate stated herein.

**FORCE MAJEURE:** Neither CARRIER nor SHIPPER shall be liable for failure to perform or for delays in performance resulting from or occasioned by: (a) allocations, expropriations, requisitions, priorities, restraints or other acts of governmental or civil or military or naval authorities, (b) political boycotts, (c) acts of God or acts of the elements, (d) unscheduled river or lock outages or closures, (e) floods or high water, (f) ice, (g) defects, failures or breakages in hull, machinery, equipment or appliances, (h) acts of war, invasion, hostilities, interferences of public enemies or belligerents, (i) civil strife, riots or civil commotions, (j) sabotage, vandalism, or malicious mischief, (k) pirates or robbers by land or water, (l) strikes, lockouts, labor disputes or disturbances, (m) fire or explosion from any cause or wheresoever occurring, (n) epidemics, pestilence or quarantines or embargoes, or (o) for any other cause whatsoever beyond the reasonable control of the respective parties, whether of the kind enumerated or otherwise. In addition, in the event the U.S. Coast Guard interprets and enforces current or future regulations in such a manner as to require any equipment modification or certification by CARRIER or other classification society or to require equipment load-line designation, then CARRIER shall be excused and shall not be liable for any failure to perform or for any delays in performance of its duties or obligations under this contract. When it becomes known to either party that any one of the foregoing conditions of force majeure exist, then that party shall immediately notify the other party in writing of the occurrence of force majeure.

**CARRIER'S LIABILITY:** Neither the CARRIER nor its equipment shall be responsible or liable for cargo loss, damage or contamination (or for any expense in connection therewith) caused directly or indirectly by or arising or resulting from: (a) act, neglect or default of the master, mariner, pilot or the servants of the CARRIER in the navigation or in the management of the vessel; (b) fire or explosion; (c) perils, dangers and accidents of the sea, of rivers or of other navigable waters; (d) collisions or strandings; (e) act of God; (f) act of war; (g) act of public enemies and/or pirates or robbers by land or water; (h) arrest or restraint of princes, rulers or people or seizure under legal process; (i) quarantine restrictions or embargoes; (j) act or omission of the SHIPPER or owner of the cargo, their agents or representatives; (k) strikes or lockouts or work stoppages or restraints of labor from whatever cause, whether partial or general; (l) riots and civil commotions; (m) saving or attempting to save life or property on the water; (n) wastage in bulk or weight or any other loss or damage arising from inherent defect, quality or vice of the cargo; (o) any latent defect in the shipment; (p) shrinkage, expansion, or other change in the cargo due to natural causes; (q) insufficiency of packing; (r) insufficiency or inadequacy of marks; (s) the physical act of loading or unloading; and (t) any other cause arising without the actual fault or privity of the CARRIER. CARRIER shall not be liable for delay in the delivery of the shipment to destination or for any diminution in market value of the cargo. CARRIER shall not be liable or responsible for lost profits or for any other consequential damages or special damages under any circumstances. Nothing in this contract of affreightment shall operate to limit or deprive the CARRIER of any statutory protection or exemption from, or limitation of, liability. Further, as a condition precedent to recovery against the CARRIER, any and all claims against the CARRIER must be asserted in writing with the CARRIER within six months after delivery of the shipment, or in the case of failure to make delivery, within one year after the date of delivery of the shipment, or in the case of failure to make delivery, then within one year and one day after time for delivery has elapsed, otherwise CARRIER shall be discharged from all liability in respect of all loss, damage, contamination or expense to cargo carried hereunder.

**GENERAL AVERAGE:** General average shall be adjusted, stated, and settled according to the York-Antwerp Rules 1994 at the Port of New Orleans or last port of discharge, at CARRIER's option, and as to matters not provided for in these rules, according to the laws and usages and practices at the Port of New Orleans or any other place at the option of the CARRIER. The general average in each instance shall be prepared by average adjusters selected by the CARRIER. The average agreement and bond, together with such additional security as may be required by the CARRIER, shall be furnished before delivery of the goods. In the event of accident, danger, damage or disaster, before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the CARRIER is not responsible by statute, contract or otherwise, the SHIPPER, consignee or owner of the cargo shall contribute with the CARRIER in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay any salvage and special charges incurred in respect of the cargo. Contribution in general average shall be limited to the carrying barge, cargo and pending freight.

**INSURANCE:** During the duration of this contract of affreightment, CARRIER shall maintain hull insurance and protection and indemnity insurance on its equipment.

**FORUM SELECTION:** The terms and conditions of this contract of affreightment, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the general maritime law of the United States of America. Any controversy, dispute, claim, demand, or lawsuit arising out of this contract of affreightment shall be brought in and decided by the U.S. District Court for the Eastern District of Louisiana (New Orleans, Louisiana).

**NOTICES:** All notices shall be in writing and furnished to the other party by facsimile or by wire at the address set forth on the front side of this contract of affreightment.

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4   TRAVELERS PROPERTY         CIVIL ACTION
    CASUALTY, et al.

5                       NO. 00-0130
    VERSUS

6                       SECTION "L"(2)
    THE MG-332 AND

7   MGR-39, etc., et al.       JUDGE FALLON
                       MAG. WILKINSON

8

9      30(b)(6) Deposition of **PROFESSIONAL**

10 **MARINE SURVEYORS & CONSULTANTS**, through its
designated representative, **RICHARD WAYNE**

11 **COXE**, and individually of **RICHARD WAYNE**
**COXE**, 7076 Richards Drive, Baton Rouge,

12 Louisiana 70809, taken in the offices of
Emmett, Cobb, Waits & Kessenich, 1515

13 Poydras Street, Suite 1950, New Orleans,
Louisiana 70112, on Tuesday, the 22nd day of

14 May, 2001.

15

16 <u>APPEARANCES</u>:

17      CHOPIN, WAGAR, COLE, RICHARD,
       REBOUL & KUTCHER, L.L.P.

18      (By: John S. Bair, Esq.)
     Two Lakeway Center, Suite 900

19      3850 North Causeway Boulevard
     Metairie, Louisiana 70002

20

       ATTORNEYS FOR TRAVELERS PROPERTY

21        CASUALTY AND CII CARBON, L.L.C.

22      STAINES & EPPLING
     (By: Anthony J. Staines, Esq.)

23      3500 N. Causeway Boulevard, Suite 820
     Metairie, Louisiana 70002

24

       ATTORNEYS FOR ST. JOHN FLEETING,

25        INC.

PROFESSIONAL SHORTHAND REPORTERS, INC.
Toll Free 1-800-536-5255
http://www.psrdepo.com

601 Poydras Street
Suite 1615
New Orleans, LA 70130
(504) 529-5255

5555 Hilton Avenue
Suite 203
Baton Rouge, LA 70808
(225) 924-3488

Shreveport, LA 71101
(318) 213-1055

1          Q      This report, once it was

2    prepared -- Can you tell me when it was

3    prepared, this typewritten survey report?

4          A      It's on the front, first page,

5    June 21st.

6          Q      Okay.

7          A      No, that can't be right.

8    MR. DECKER:

9               June 25th.

10    THE WITNESS:

11               June 25th, yes.  I'm sorry.  The

12    barge was loaded June 21st.

13    EXAMINATION BY MR. STAINES:

14          Q      When would the information that

15    you found based on the post -- "you" being

16    Professional Marine Surveyors, found based

17    on the post-loading survey, when would that

18    information have been provided to either CII

19    Carbon or M/G Transport or M/G-T Services?

20    Can you tell me when the information that's

21    contained, the readings that were obtained

22    after the post-loading survey, when that

23    information would have been provided to

24    either M/G-T, meaning M/G Transport or M/G-T

25    Services or CII Carbon?

1      MR. McMAHON:

2          Instead of having him repeat it,

3  can you break down your answer as to each if

4  it's different?

5      MR. STAINES:

6          Yes, that's fine.

7      THE WITNESS:

8          As far as the draft readings

9  themselves?

10  EXAMINATION BY MR. STAINES:

11     Q     Yes, sir.

12     A     The draft readings, CII, we don't

13  provide them with any draft readings until

14  the actual report.

15     Q     You say "them." You're talking

16  about CII Carbon?

17     A     CII Carbon, basically, which

18  Exhibit 6 is mailed to them. They are

19  provided the tonnage only at completion.

20     Q     So all the information is mailed

21  to them after it's completed, so it would

22  have been sometime on June 25th or

23  thereafter?

24     A     After.

25     Q     Okay. But you said the tonnage is

PROFESSIONAL SHORTHAND REPORTERS, INC.
Toll Free 1-800-536-5255
http://www.psrdepo.com

601 Poydras Street
Suite 1615
New Orleans, LA 70130
(504) 529-5255

5555 Hilton Avenue
Suite 203
Baton Rouge, LA 70808
(225) 924-3488

330 Marshall Street
Suite 1200
Shreveport, LA 71101
(318) 213-1055

1    provided to them earlier?

2        A    The tonnage is provided to them

3    via tonnage certificate, which you have a

4    copy of.

5        Q    All right.  And that would have

6    been provided to them when?

7        A    Whenever we fax it to them.  We

8    fax it to them.  Whatever the date is on

9    that report.

10       Q    Let's see if we can find the

11   Tonnage Certificate.

12       A    You had it earlier.

13       Q    I did?

14       A    Right here (indicating).  You have

15   a typewritten and a handwritten.

16   MR. McMAHON:

17           I think the typed was attached.

18   THE WITNESS:

19           This is typewritten.

20   MR. McMAHON:

21           I mean, the handwritten was

22   attached.

23       THE WITNESS:

24           The handwritten is right here

25   (indicating).

PROFESSIONAL SHORTHAND REPORTERS, INC.
Toll Free 1-800-536-5255
http://www.psrdepo.com

601 Poydras Street
Suite 1615
New Orleans, LA 70130
(504) 529-5255

5555 Hilton Avenue
Suite 203
Baton Rouge, LA 70808
(225) 924-3488

330 Marshall Street
Suite 1200
Shreveport, LA 71101
(318) 213-1055

1    EXAMINATION BY MR. STAINES:

2        Q    Okay.  We will just mark this as

3    the next one.  Now, what would have been

4    provided by fax?

5        A    This (indicating).

6        Q    "This" being Exhibit 8 that we're

7    marking now as the typewritten Tonnage

8    Certificate?

9        A    Tonnage Certificate.

10       Q    That would have been faxed to CII

11   Carbon?

12       A    Mr. Bill Doyle.

13       Q    Can you tell me on what date?

14       A    It says here it was sent the 25th.

15   June 25th.

16   MR. McMAHON:

17            Where are you obtaining the date

18   from?

19   THE WITNESS:

20            Right here (indicating).

21   MR. McMAHON:

22            Okay.

23   EXAMINATION BY MR. STAINES:

24       Q    Can you point that out to me?

25       A    The very top right here

PROFESSIONAL SHORTHAND REPORTERS, INC.
Toll Free 1-800-536-5255
http://www.psrdepo.com

601 Poydras Street
Suite 1615
New Orleans, LA 70130
(504) 529-5255

5555 Hilton Avenue
Suite 203
Baton Rouge, LA 70808
(225) 924-3488

330 Marshall Street
Suite 1200
Shreveport, LA 71101
(318) 213-1055

1    (indicating).

2        Q    You're referring then to the fax

3    typed information at the very top of the

4    page?

5        A    Correct.

6        Q    Would any other information have

7    been provided to CII Carbon other than the

8    Tonnage Certificate regarding the readings

9    found on either the cleanliness survey or

10   the draft survey?

11       MR. McMAHON:

12           At what point in time, Tony?

13       MR. STAINES:

14           At any time.

15       THE WITNESS:

16           Yes, they get a copy of the report

17   that I send them, that you have a copy of,

18   the typed report by mail.

19   EXAMINATION BY MR. STAINES:

20       Q    Would any other information have

21   been sent to CII Carbon prior to the barges

22   leaving Cooper/T. Smith, if you know?

23       A    Not from me, no.

24       Q    Now, let's talk about M/G

25   Transport or M/G-T Services.   The same

1    questions, what information would you have

2    provided to M/G-T Services?

3         A    We don't supply them with

4    anything.

5         Q    Okay.

6         A    That comes through CII.

7         Q    All right.

8         A    If we did send something, it's

9    because they called and asked for the

10   tonnages, but the only thing we would send

11   them would be the Tonnage Certificate.

12        Q    M/G-T?

13        A    Yes.

14        Q    All right.

15        A    Normally we go through CII and

16   have them forward everything to M/G-T.

17        Q    This document that's Exhibit 8, in

18   the upper right-hand corner, it's got the

19   word written "To" and then it has several

20   initials.  "MGT" is one of them.  Would that

21   indicate that this document was provided to

22   M/G-T by --

23        A    I don't think that's any of our

24   writing.  I don't know where that came from.

25        Q    You.

PROFESSIONAL SHORTHAND REPORTERS, INC.
Toll Free 1-800-536-5255
http://www.psrdepo.com

601 Poydras Street
Suite 1615
New Orleans, LA 70130
(504) 529-5255

5555 Hilton Avenue
Suite 203
Baton Rouge, LA 70808
(225) 924-3488

330 Marshall Street
Suite 1200
Shreveport, LA 71101
(318) 213-1055

*Professional Marine Surveyors*
*and*
*Consultants*

P.O. Box 66414
Baton Rouge, LA 70896

(225) 766-8992
FAX: (225) 766-5596

### DATE OF SURVEY

### DATE OF REPORT

**JUNE 21, 1999**

**JUNE 25, 1999**

### SUBJECT

### COKE IN BULK

### DISPLACEMENT

### SURVEY

### "MG 332"

### "M/S ARGONAUT"

### ATTENDING

### SURVEYORS

### R. WAYNE COXE

### &

### RODDY HURST



### SEE ATTACHED REPORT FOR DETAILS

THE FOLLOWING SURVEY WAS UNDERTAKEN AND THIS REPORT ISSUED ON THE FOLLOWING TERMS AND CONDITIONS:  While the owners ;
DIRECTORS of PROFESSIONAL MARINE SURVEYORS AND CONSULTANTS use their best endeavors to see that the functions of the company are prop-
executed, the company makes no warranty of any kind, either express or implied, including warranty of workmen like service, respecting its work or services,
disclaims all legal responsibility for any loss, damage, personal injury or death resulting from any act, default omission, negligence, error or breach of any
warranties.  Neither the Company, Owners or Directors, nor its surveyors, employees, representatives or agents are under any circumstances whatsoever to be i
responsible or legally liable for any inaccuracy or error in any report or certificate issued by the Company or by its surveyors or other agents or employees, or for
error of judgement, default, omission, negligence or breach of warranty or from any wntngs in bulk or weight of cargo or other loss or damage arising from inhe
defect in quality or vice of the cargo, either express or implied, including warranty or workmanlike service, arising or allegedly arising out of services of the Comp
its surveyors or other employees, representatives or agents.

COKE IN BULK

"MG 332"

M/S "ARGONAUT"

THIS IS TO CERTIFY that PROFESSIONAL MARINE SURVEYORS and CONSULTANTS, at the request of CII CARBON, L.L.C. did attend and survey the barge "MGT 332" while afloat at COOPER/T. SMITH MILE 180. The vessel was found to be an all-welded, steel-constructed, hopper barge with principal dimensions of 195 feet in length, by 35 feet in breadth, by 12 feet in depth. The vessel has a raked bow with a single cargo hopper, fitted with wing compartments to port and starboard of cargo hopper and an interbottom space below cargo hopper.

The survey conducted to determine by light and loaded draft the actual cargo of COKE IN BULK .

### DISPLACEMENT SURVEY

|   |   |   | START<br>1515 HOURS<br>JUNE 21, 1999 | COMPLETION<br>2140 HOURS<br>JUNE 21, 1999 |
|---|---|---|---|---|
| 1. | a. | Forward Port | 2'00.75001" | 11'02.50000" |
|  | b. | Forward Starboard | 1'08.37501" | 10'01.75000" |
|  | c. | Forward Mean | 1'10.56251" | 10'08.12500" |
| 2. | a. | After Port | 1'03.75001" | 10'11.50000" |
|  | b. | After Starboard | 1'01.00000" | 10'00.37501" |
|  | c. | After Mean | 1'02.37500" | 10'05.93750" |
| 3. |  | Mean Forward & After<br>line 1c + 2c<br>2 | 1'06.46875" | 10'07.03125" |
| 4. | a. | Midship Port | 1'08.12500" | 11'00.75001" |
|  | b. | Midship Starboard | 1'04.62501" | 10'01.00000" |
|  | c. | Midship Mean | 1'06.37500" | 10'06.87500" |
| 5. |  | Mean of Means<br>line 3 + 4c<br>2 | 1'06.42188" | 10'06.95313" |

6. Draft Corrected for Deformation

$$\frac{\text{line } 4\text{c} + 5}{2}$$

            1'06.39844"      10'06.91407"

7. Displacement Cubic Feet
Fresh Water        9,206.604      68,083.164

8. Displacement Tonnage
Fresh Water        287.375      2,125.148

9. Density        0.9965      0.9965

10. Correction for Density      1.006      7.396

11. Corrected Displacement Tonnage      286.369      2,117.753

12. Difference Between Displacement
at Start and Completion      1,831.384

    TOTAL POUNDS      3,662.767.250

    SHORT TONS      1,831.384

    METRIC TONS      1,661.403

    LONG TONS      1,635.164

NOTE: Vessel's voids were found to contain approximately 0 to 8 inches of water, sludge and scale prior to and after receiving cargo.

The foregoing statements are rendered without prejudice to the rights of party or parties concerned.

Attending Surveyors:      PROFESSIONAL MARINE SURVEYORS
              AND CONSULTANTS:

Roddy Hurst      R. Wayne Coxe
Roddy Hurst      R. Wayne Coxe
Marine Surveyor      Certified Professional
              Marine Surveyor

THE FOREGOING SURVEY WAS UNDERTAKEN AND THIS REPORT ISSUED ON THE FOLLOWING TERMS AND CONDITIONS: While the owners and DIRECTORS of PROFESSIONAL MARINE SURVEYORS AND CONSULTANTS use their best endeavors to see that the functions of the company are properly executed, the company makes no warranty of any kind, either express or implied, including warranty of workman like service, respecting its work or services, and disclaims all legal responsibility for any loss, damage, personal injury or death resulting from any act, default omission, negligence, error or breach of any said warrantion. Neither the Company, Owners or Directors, nor its surveyors, employees, representatives or agents are under any circumstances whatsoever to be held responsible or legally liable for any inaccuracy or error in any report or certificate issued by the Company or by its surveyors or other agents or employees, or for any error of judgement, default, omission, negligence or breach of warranty or from any wastage in bulk or weight of cargo or other loss or damage arising from inherent defect in quality or vice of the cargo, either express or implied, including warranty or workmanlike service, arising or allegedly arising out of services of the Company, its surveyors or other employees, representatives or agents.

TUCK DGGA
at Weber

6:22

Cargo Case
BARGE INFORMATION

This information to be supplied on discharge

BARGE NAME OR NUMBER    ING 23___

Date _____                    Dra. _____
Where Built _____             Year _____
Official Number _____         Length _____
Net ___ Tonnage _____         Breadth _____
Oil Loaded From _____         Depth _____
Rate Covers _____             Clift. per _____    _____/P.G.

Check and measure all water in cargo

LIGHT
Bow _____
P 1 _____        5 1 _____
P 2 _____        5 2 _____
P 3 _____        5 3 _____
P 4 _____        5 4 _____
P 5 _____        5 5 _____
P 6 _____        5 6 _____
Stern _____
Temperature of water _____ °F.

| Freeboard Light | | | Freeboard Load | |
|---|---|---|---|---|
| F-P _____ | P-S _____ | F-P 12" | P-S 12¼" |
| M-P _____ | M-S _____ | M-P 11½" | M-S 11" |
| A-P _____ | A-S _____ | A-P 12" | A-S 11⅝" |

LOADED
Bow    0
P 1    10"        5 1    ___
P 2    7"         5 2    ___
P 3    8"         5 3    ___
P 4    8"         5 4    ___
P 5    _____     5 5    _____
P 6    _____     5 6    _____
Stern  5"
Temperature of water _____ °F.

Weather Conditions In _____    Out _____

Type or Name of Product _____

Start Time _____ hrs.        Date _____
Completion Time _____ hrs.   Date _____
Check In Time _____ hrs.     Date _____

EXHIBIT
F

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

TRAVELERS PROPERTY CASUALTY, et al.        CIVIL ACTION

-VERSUS-        NUMBER 00-0130

THE MG-332 and MGR-39, etc., et al.        SECTION L (2)
        JUDGE FALLON
        MAGISTRATE WILKINSON

: : : : : : : : : : : : : : : : : : : : : : : :

## STATEMENT OF CONTESTED MATERIAL FACTS

NOW COMES St. John Fleeting, Inc., through undersigned counsel, and submits the following Contested Material Facts pursuant to Rule 56 of the Federal Rules of Civil Procedure:

1.      The responsibilities of Professional Marine Surveyors & Consultants and Wayne Coxe and Roddy Hurst were not limited to the cleanliness inspection and draft surveys of the barge MG 332. Rather, Professional Marine's responsibilities included conveying and reporting information regarding conditions of the barge which indicated a problem, particularly relative to freeboard, listing, and water in the wing tanks which were indicative of potential problems with the integrity of the barge.

2.      The failure of Professional Marine Surveyors & Consultants and Wayne Coxe and Roddy Hurst to convey pertinent information regarding the condition of the barge MG 332 resulted

in the inability of the shipper, CII Carbon, and eventually the carrier, M/G-T Services, Inc., to address the integrity of the barge and the decision of whether the barge could maintain the cargo loaded in the barge for its future intended purposes.

Respectfully Submitted;

STAINES & EPPLING

ANTHONY J. STAINES, T.A. (12388)
3500 No. Causeway Blvd.
Suite 820
Metairie, LA 70002
Telephone: (504) 838-0019
Counsel for St. John Fleeting, Inc.

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by the service method indicated below:

[x] U.S. Mail
[ ] Hand Delivery
[ ] Fax
[ ] Other

This 17 day of July 2001.

-2-